OPINION OF THE COURT BY JUSTICE CUNNINGHAM
This case arises from the death of an inmate. The legal issue concerns the duties of jail personnel to protect inmates in their custody. In a split decision, the Court of Appeals affirmed the trial court's order granting summary judgment in favor of the jail personnel. For the foregoing reasons, we affirm the decision of the Court of Appeals.
Background
On November 28, 2011, Peggy McWhorter pled guilty in Russell District Court to a drug-related second offense D.U.I., for which she had been arrested the previous month. McWhorter received a sentence of 60 days in jail, seven days of which were to be served on consecutive weekends beginning on December 9th. The remainder was to be probated for two years. McWhorter served the first weekend in jail, snoring loudly and sleeping most of the time.
When she reported for her second weekend shortly before 6 p.m. on Friday, December 16, 2011, McWhorter denied having ingested any dangerous amount or mixture of alcohol or drugs. McWhorter was then housed in a detoxification ("detox") cell with two other detainees. After receiving a dinner tray, McWhorter announced her intent to "sleep off her weekend." The Russell County Detention Center Detox Isolation Log and video surveillance verified that several deputies passed by the cell and signed the log approximately hourly, fifteen times in all. The first notation was entered at 6:30 p.m. and the second notation was entered at 7:00 p.m. Both stated "OK." All other entries simply noted "Asleep" prior to "No Response" at 6:10 a.m. McWhorter's death was attributed primarily to a hydrocodone overdose. The precise timing of her death is unclear.
Appellant, Nicole Peterson as Executrix, filed a wrongful death suit on behalf of McWhorter's estate. Wanda Russell is also *348 an Appellant in this case. She is the guardian and next friend of McWhorter's two minor children. The complaint named as defendants Russell County Jailer Bobby Dunbar and nine of his deputies. However, Appellants' brief on appeal from the Russell Circuit Court's summary judgment for all defendants requested relief against only five deputies: Bethany Foley, Dennis Grayum, Debbie Grayum, Scott Hadley, and Kevin Booth (collectively referred to as "Deputies").
As previously noted, the Court of Appeals affirmed the trial court's order granting summary judgment. We granted discretionary review.
Standard of Review
"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." Coomer v. CSX Transp. Inc. , 319 S.W.3d 366, 370 (Ky. 2010). We review a trial court's summary judgment ruling de novo. Blankenship v. Collier , 302 S.W.3d 665, 668 (Ky. 2010). We must also view the record in a light most favorable to the nonmoving party and resolve all reasonable doubts in that party's favor. Steelvest, Inc. v. Scansteel Serv. Ctr., Inc. , 807 S.W.2d 476, 480 (Ky. 1991).
Qualified Immunity
For purposes of determining qualified immunity for government officials, the duties of those officials are categorized as either ministerial or discretionary. The Court explained this distinction in Yanero v. Davis :
Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e. , those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, ...; (2) in good faith; and (3) within the scope of the employee's authority.
....
Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, i.e. , one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.
65 S.W.3d 510, 522 (Ky. 2001) (citations omitted).
Intake Procedures
Deputy Foley participated in McWhorter's intake processing and escorted her to the detox cell around 6:30 p.m. on December 16, 2011. Foley went off duty at 7 p.m.
Appellants argue that Deputy Foley erroneously failed to shower McWhorter prior to placing her in the cell. According to Appellants, this would have provided Foley with an additional opportunity to observe McWhorter's behavior and to assess whether she was intoxicated. We disagree. First off, this argument is tangential to central issues argued in this case-the frequency and sufficiency of the Deputies' surveillance of McWhorter throughout the night she died. And although Appellants cite that Jailor Dunbar conceded that Deputy Foley violated jail procedures by not showering McWhorter, Appellants fail to cite which specific regulation was violated. Our review of the Russell County Detention Center Policies fails to indicate any showering regulation that was violated here. Moreover, it strains credulity to conclude that subjecting McWhorter to a *349 shower would have had any material impact on the cause of her death.
501 KAR 3:090 § 1, subsections (7) and (9), create a duty to perform a medical screening of incoming inmates and to inform them of the methods of gaining access to medical care. These requirements are absolute, certain, and imperative. Therefore, they are ministerial. Deputy Foley satisfied her duties here by performing and documenting the medical screening and informing McWhorter of the methods of gaining access to medical care. Cf. Hedgepath v. Pelphrey , 520 Fed. Appx. 385 (6th Cir. 2013) (acknowledging that the duty described in 501 KAR 3:090 was violated where deputies failed to perform any initial medical assessment whatsoever). Since Deputy Foley went off duty at 7 p.m., she had no surveillance duties for the night in question. Thus, she was entitled to a judgment as a matter of law.
Detox Surveillance
501 KAR 3:060 § 2(2) governs surveillance procedures for certain types of inmates:
Jail personnel shall conduct and document direct in-person surveillance on an irregular schedule, at least every twenty (20) minutes on the following classes of prisoners:
(a) Suicidal;
(b) Mentally or emotionally disturbed, if housed in a single cell; or
(c) In detox cell.
It is undisputed that McWhorter was placed in a detox cell and that the Deputies did not perform twenty-minute checks. However, it is disputed whether McWhorter was placed in the detox cell for detox purposes or whether she was placed there due to her status as a weekend inmate. Nevertheless, she remained in the detox cell for the entirety of her incarceration. The surveillance log outside of her cell was labeled "Russell County Detention Center Detox Isolation Log." This log also specifically listed McWhorter as the cell's inhabitant. The plain language of 501 KAR 3:060 § 2(2) and the clear designation of McWhorter's cell as a "detox cell" required the Deputies to check on her every twenty-minutes, which they failed to do. Therefore, this ministerial duty was violated.
Much has been argued in this case about the application of qualified immunity to various jail regulations concerning the frequency and sufficiency of the Deputies' surveillance of McWhorter throughout the night she died. However, we need not address these issues.
The trial court's order granting summary judgment in this case failed to provide any analysis whatsoever. The court's order denying Appellants' motion to alter, amend, or vacate the summary judgment was also denied by the court without explanation. Therefore, it is unclear from the order on what basis the trial court ruled in favor of the Deputies. Although the arguments advanced by the parties on appeal primarily concern the issue of qualified immunity, it is well-established that this Court may affirm the trial court for any reason in the record. E.g., Ky. Farm Bureau Mut. Ins. Co. v. Shelter Mut. Ins. Co. , 326 S.W.3d 803, 805 n. 3 (Ky. 2010). Even if a jury could reasonably determine that the Deputies' ministerial duties were violated here, it is clear from the record that Appellants cannot prove causation.
Causation
The undisputed evidence indicates that several different Deputies visited McWhorter's cell and signed the log at least every hour and, in fact, sometimes more frequently. As previously noted, the jailors signed the log fifteen times in all. The notations entered at 6:30 and 7:00 p.m.
*350 stated "OK." All other entries simply noted "Asleep" prior to "No Response" at 6:10 a.m. Although the Deputies may not have looked into her cell on every occasion, the record reflects that they often did. In fact, the jail surveillance video revealed that six different Deputies observed McWhorter for a total of twenty-seven times in the eleven hours and forty minutes she was held in the Detention Center. Not all these observations were officially logged.
In any event, there is no way that Appellants can prove which of these Deputies, if any, was the cause of McWhorter's death. Similarly, apportionment of fault under these facts would be purely speculative. It is also critical that nothing in the record indicates McWhorter's time of death. As noted by the Deputies in their brief, "Appellants offered no medical expert, nor could they have found one, to suggest to a reasonable degree of medical probability that McWhorter could have been revived after not breathing for twenty minutes." Appellants have failed to provide any evidence to the contrary. Because there is no genuine issue of material fact concerning causation, summary judgment for the Deputies was proper.
Conclusion
We hereby affirm the decision of the Court of Appeals affirming the trial court's order granting summary judgment.
Minton, C.J.; Cunningham, Hughes, Keller, Venters, and Wright, JJ., sitting. Minton, C.J.; Hughes, Venters, and Wright, JJ., concur. Keller, J., dissents by separate opinion. VanMeter, J., not sitting.
I must respectfully dissent from the majority's opinion affirming the Court of Appeals. I agree with then-Judge VanMeter, who dissented from the Court of Appeals' majority opinion. I agree with now-Justice VanMeter, who stated that the court's assessment of these facts is "a judicial weighing of the evidence," a task uniquely and proprietarily granted to "the jury as fact finder."
The summary judgment standard in Kentucky is more stringent than the federal corollary. Our Court has "repeatedly admonished that the rule [of summary judgment] is to be cautiously applied." Steelvest, Inc. v. Scansteel Serv. Ctr., Inc. , 807 S.W.2d 476, 480 (Ky. 1991) (citing Rowland v. Miller's Adm'r , 307 S.W.2d 3 (Ky. 1956) ). "Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact." Steelvest , 807 S.W.2d at 480 (citing Puckett v. Elsner , 303 S.W.2d 250 (Ky. 1957) ). Under federal law, the United States Supreme Court issued several opinions "encourag[ing] greater use of summary judgments to dispose of litigation." Steelvest , 807 S.W.2d at 481 (citations omitted). However, "[u]nder the Kentucky standard, we conclude that the movant should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy." Id. at 482 (citing Isaacs v. Cox , 431 S.W.2d 494 (Ky. 1968) ). This Court has held firm to the principle that summary judgment should be applied cautiously; "[i]t is vital that we not sever litigants from their right of trial, if they do in fact have valid issues to try, just for the sake of efficiency and expediency." Steelvest , 807 S.W.2d at 483. I concede that this case is complicated for two reasons: (1) we are faced with the preliminary issue of immunity before reaching the merits of the case; and (2) the trial court's order granting summary judgment listed no grounds for the order, leaving appellate review to mindfully fill in the gaps from the record.
*351 The first issue the Court must determine is whether any of the defendants/appellees were entitled to summary judgment on immunity grounds. "Qualified official immunity applies to public officers or employees if their actions are discretionary (i.e., involving personal deliberation, decisions, and judgment) and are made in good faith and within the scope of their authority or employment." Jacobi v. Holbert , 553 S.W.3d 246, 253 (Ky. 2018) (quoting Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc. , 286 S.W.3d 790, 808-09 (Ky. 2009) (quoting Autry v. Western Kentucky University , 219 S.W.3d 713, 717 (Ky. 2007) ) ). However, "an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act." Yanero v. Davis , 65 S.W.3d 510, 522 (Ky. 2001). "[A] discretionary act is usually described as one calling for a 'good faith judgment call[ ] made in a legally uncertain environment.' " Jacobi , 553 S.W.3d at 261 (quoting Marson v. Thomason , 438 S.W.3d 292, 297 (Ky. 2014) (quoting Yanero , 65 S.W.3d at 522 ) ). "[D]iscretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." Jacobi , 553 S.W.3d at 261 (quoting Haney v. Monsky , 311 S.W.3d 235, 240 (Ky. 2010) ).
I am extremely empathetic to the constant strain that substance abuse and the opioid crisis have placed on our jails, jailers, and their staff. Our county jails are not drug rehabilitation facilities or hospitals. Their function is incarceration. Jailers and deputies, who are not trained like nurses or medical staff, are required to assess symptoms and observe behavior to determine whether an incoming prisoner is under the influence of some illicit substance. I completely agree with my learned colleagues at the Court of Appeals that such an assessment-the decision as to whether an inmate is in need of special supervision or not-is a discretionary task and that any determination as to status must be clothed in the appropriate immunity. However, the issue in this case arises from more than just the initial assessment. Unfortunately, because at least some of the deputies' breaches of duty were ministerial in nature, they were not protected by the doctrine of qualified immunity.
Jailer Dunbar, as the majority cites, admitted that there was a policy of showering prisoners during intake and that Deputy Foley violated that policy. This is a do or do not task; it is ministerial at its heart. Rather than admitting this was clearly a ministerial task, the majority simply states that "it strains credulity to conclude that subjecting McWhorter to a shower would have had any material impact on the cause of her death." However, this is not the standard on summary judgment. "Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact." Steelvest , 807 S.W.2d at 480 (citing Puckett , 303 S.W.2d 250 ). This Court may question the reliability or provability of Peterson's case. However, this does not automatically mean that summary judgment is appropriate. I would also note that even Deputy Foley admitted that showering provides additional time for observation of an inmate, to look for signs and symptoms of intoxication; Jailer Dunbar agreed. Here, causation is clearly a tangential link for the plaintiff to prove; but I remain unconvinced that the movants have demonstrated "such clarity that there is no room left for controversy." Steelvest , 807 S.W.2d at 482 (citing Isaacs , 431 S.W.2d 494 ). The majority opinion critiques Appellants for failing to cite a specific *352 regulation; but the Appellants cited to deposition testimony from the Jailer himself as to a violation of a policy. I am at a loss as to how this does not create a genuine issue of material fact.
The majority opinion also holds that the required twenty-minute checks on McWhorter, as a prisoner in a detox cell, were ministerial duties. I agree with this analysis. However, the majority goes further and finds that, even given a violation of this ministerial duty, Peterson is unable to prove her case. Here, the trial court failed to elucidate the record with reasoning as to its grant of summary judgment. The majority acknowledges that the main issue on appeal concerned qualified immunity. Yet, rather than simply remanding to the trial court for further proceedings, a majority of this Court has sounded the death knell for Peterson's entire case. The majority states that "it is clear from the record" that Peterson's case will fail in proving causation. It is impossible to know this fact for certain at this stage of the litigation.
The majority cites to the record and notes that although the deputies did not look into McWhorter's cell every time they checked off the observation log, the deputies often did look in. Fatally for summary judgment, this statement inherently implies that the deputies did not look into the cell at every twenty-minute period, as required. Thus, if this failure contributed to McWhorter's death, then summary judgment is entirely inappropriate. Rather than, again, remanding back to the trial court for further proceedings, the majority disposes of Peterson's complaint with five sentences, beginning with "In any event, there is no way that Appellants can prove which of these Deputies, if any, was the cause of McWhorter's death."[1] This is exactly why our apportionment instructions were created.
Thus, the majority argues that, because apportionment would be speculative, the trial court must grant summary judgment. But that is not the issue before this Court. "Fault may not be properly allocated to a party, a dismissed party or settling nonparty unless the court or the jury first finds that the party was at fault; otherwise, the party has no fault to allocate." CertainTeed Corp. v. Dexter , 330 S.W.3d 64, 74 (Ky. 2010) (quoting Owens Coming Fiberglas Corp. v. Parrish , 58 S.W.3d 467, 482 n. 5 (Ky. 2001) (citation omitted) ). Thus, "to apportion fault among multiple tortfeasors, the plaintiff must prove each tortfeasor's liability beyond the plaintiff[']s burden of proof (usually by a preponderance of evidence in a civil case)." CertainTeed , 330 S.W.3d at 73. Before apportionment ever becomes an issue, the plaintiff bears the burden of proving each and every defendant's liability. Only once liability is proven is the jury instructed on apportionment.
As Justice VanMeter noted at the time of the Court of Appeals' opinion, "our comparative fault jury instructions are designed to apportion fault between the parties." We entrust juries with difficult and *353 technical apportionment decisions in myriad cases. For example, in a medical malpractice claim, juries are forced to decide how to allocate fault as to a doctor's alleged mistake in surgery, a nurse's alleged omission in records, an administrator's alleged negligent hiring, etc. These are highly complex issues yet we entrust a jury with that responsibility. There is no magical number in a jury's assessment of apportionment; an appellate court cannot say a specific number is correct and another number is wrong. Our review itself of apportionment is speculative, but we defer to the wisdom of the jury as required by our Constitution. Because the question of apportionment is complex is not a reason to grant summary judgment.
Some, if not all of these defendants, for some of the reasons stated by the majority, may receive a directed verdict. But, as of right now, I am unwilling to take that leap and foreclose Peterson's case through a grant of summary judgment. Peterson presented proof of causation. Dr. Nichols, the deputies' expert, stated that McWhorter's alleged nodding back and forth was a sign of hydrocodone overdose. He also stated that loud snoring is a sign of opioid intoxication. Video surveillance shows that McWhorter was in the same position from five minutes after being placed in the cell until she was found unresponsive the next morning, other than when her arm flopped to the side over eight hours prior to being found deceased. Dr. Nichols stated that if a person overdosing does not respond to stimuli, they can often be treated with Naloxone, reversing the effects of opioid toxicity. The overdosing patient will then wake up. Dr. Nichols testified that if Naloxone had been timely administered, McWhorter would have survived because she could have been revived at any time until her death. At oral argument, Appellant's counsel also stated that discovery had not yet been completed and they intended to look into further expert testimony to substantiate their case. This is a sufficient showing to withstand a motion for summary judgment. There remain various questions of material fact, including a question as to causation and whether any difference in the deputies' behavior would have prevented McWhorter's death.
Regarding expert testimony, this Court has often noted that a particular argument goes to weight, not admissibility. See e.g. Thomas v. Commonwealth , 153 S.W.3d 772, 780-81 (Ky. 2004) (citations omitted). Here, the majority's critiques of testimony and proof go to weight, not summary judgment. See James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co. , 814 S.W.2d 273, 276 (Ky. 1991) (citing Ogden v. Employers Fire Ins. Co. , 503 S.W.2d 727 (Ky. 1973) ) ("Questions relating to the credibility of witnesses and the weight of the evidence must await trial."). Foley and the jailers will have ample opportunity to argue the weaknesses in Peterson's case. Such arguments may very well prevail at trial. But that is not Kentucky's summary judgment standard.
Justice VanMeter succinctly stated the core of why I would reverse the Court of Appeals and remand back to the Russell Circuit Court for further proceedings: "In viewing the record most favorably to Peterson, I am unable to say that Peterson cannot produce evidence which would induce a reasonable jury to find that [the deputies] negligently performed [their] ministerial duties ... The purview of this court is not to act as the factfinder; such is the function of the jury." Peterson has presented sufficient evidence to withstand summary judgment. I would remand this case back to the trial court for proceedings *354 consistent with the foregoing dissenting opinion.

I also question the legitimacy of utilizing causation to affirm the trial court and Court of Appeals here. Appellants did not brief the issue at all in either of its briefs and Appellees wrote one and a half pages on the weakness of Appellant's causation argument as an alternative argument. This was hardly a fully-briefed issue for the Court to dismiss an entire case. The Court of Appeals did not discuss causation in its thorough opinion. Yet, a majority of this Court is extinguishing Peterson's entire cause of action on an argument similar to Yogi Berra's statement, "If you ask me anything I don't know, I'm not going to answer." Simply because we cannot state Peterson's case will prevail at trial does not mean summary judgment is procedurally appropriate.