RENDERED: MARCH 19, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0436-DG

SCHNEIDER ELECTRIC USA, INC.,                                    APPELLANT
F/K/A SQUARE D

V.
                        ON REVIEW FROM COURT OF APPEALS
                          NO. 2022-CA-0184 & 2022-CA-0190
                        FAYETTE CIRCUIT COURT NO. 16-CI-01842

PAUL WILLIAMS, INDIVIDUALLY;                                     APPELLEES
COLBY WILLIAMS, BY AND THROUGH
HIS PARENT, GUARDIAN AND NEXT
FRIEND, PAUL WILLIAMS; PAUL
WILLIAMS, AS EXECUTOR OF THE
ESTATE OF VICKIE WILLIAMS; AND
UNION CARBIDE CORPORATION

AND

2023-SC-0440-DG

UNION CARBIDE CORPORATION                                        APPELLANT

V.
                        ON REVIEW FROM COURT OF APPEALS
                          NO. 2022-CA-0184 & 2022-CA-0190
                        FAYETTE CIRCUIT COURT NO. 16-CI-01842

SCHNEIDER ELECTRIC USA, INC.,                                    APPELLEES
F/K/A SQUARE D; COLBY WILLIAMS,
BY AND THROUGH HIS PARENT,
GUARDIAN AND NEXT FRIEND, PAUL
WILLIAMS; PAUL WILLIAMS, AS
EXECUTOR OF THE ESTATE OF
VICKIE WILLIAMS; AND PAUL
WILLIAMS, INDIVIDUALLY

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

This appeal asks whether, under Kentucky negligence and products-liability doctrine, the summary-judgment record permits the court to declare—*as a matter of law*—that defendants owed no duty to protect against foreseeable harm from alleged household ("take-home") asbestos exposure. Specifically, whether Kentucky law recognizes a legal duty sufficient to survive summary judgment in a negligence and products-liability action arising from alleged exposure pathways involving asbestos-containing molding compounds used at Schneider Electric USA Inc., F/K/A Square D Company's ("Square D") Lexington facility and supplied by Union Carbide Corporation ("Union Carbide").

Square D's liability is pleaded in negligence; Union Carbide's liability is pleaded in negligence and products liability. The circuit court granted summary judgment to both defendants on the grounds that no duty existed. The Court of Appeals reversed, concluding that duty could not be negated because foreseeability depended on disputed facts that must be viewed in the nonmovant's favor, that there were material facts in dispute, and that summary judgment was, therefore, improper. It vacated the limiting order placed upon Williams' expert, Dr. Egilman, because the trial court did not find prejudice and because deposition testimony served as a functional form of disclosure. Lastly, the Court of Appeals affirmed the trial court's denial of the workers' compensation exclusivity claim.

2

Appellants urge that liability, and the requisite duty, should be framed as premises-duty.  However, the Court of Appeals treated the case as standard negligence with regard to Square D, as that was how the claims were procedurally brought before the court, and additionally under products liability as to Union Carbide.  The Court of Appeals analyzed duty through foreseeability under CR[1] 56.  We likewise resolve the questions presented through settled Kentucky duty and summary judgment doctrines.

We address three issues: (1) whether the trial court properly granted summary judgment on 'no duty' grounds; (2) whether the trial court abused its discretion in excluding/limiting Dr. David Egilman's opinions absent a finding of prejudice; and (3) whether the Workers' Compensation Act's exclusivity provision, KRS[2] 342.690(1), bars the claims against Square D.

We affirm the Court of Appeals.  Under Kentucky's summary judgment standard, duty cannot be negated where foreseeability turns on disputed facts that must be viewed in the nonmovant's favor.  The Court of Appeals also correctly vacated the expert-limitation order because the trial court did not find prejudice and because the deposition disclosed the substance of the opinions.  Finally, on this record, KRS 342.690(1) does not compel dismissal of the claim before us where all parties' experts, the circuit court, and the Court of Appeals agreed and treated the alleged causation as non-occupational household

---

[1] Kentucky Rules of Civil Procedure.

[2] Kentucky Revised Statutes.

3

exposure rather than an injury 'arising out of and in the course of' employment as required by the Workers' Compensation Act.

We emphasize at the outset that this appeal concerns only whether summary judgment was appropriate—not whether liability exists—and that no factual findings or credibility determinations are made here.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. PARTIES.

Appellant Union Carbide is a manufacturer.  Relevant to the proceedings, it was the manufacturer of asbestos-containing molding compounds purchased and used by Square D at its Lexington facility.  Specifically, Union Carbide manufactured phenolic molding compounds to make finished plastic products. Until 1974, some of Union Carbide's phenolic molding compounds contained asbestos fibers as a filler.  Union Carbide supplied large quantities of molding compounds to Square D during the 1960s and 1970s.  Square D incorporated those compounds into electrical components manufactured at its Lexington facility.  Square D purchased some molding compounds from Union Carbide, and until around 1974, those compounds contained asbestos fibers.  The record shows Union Carbide sold phenolic molding products, some of which contained asbestos fibers, to Square D during the time Ms. Williams lived with her parents.

Appellant Square D is also a manufacturer.  Since the late 1950s, Square D has manufactured electrical enclosures, load centers, and switches at its Lexington, Kentucky facility.  Square D used asbestos-containing molding

4

compounds in the manufacturing process of its products during the relevant period. These products were manufactured at the Lexington facility.

Vickie Williams ("Ms. Williams") was adopted by the Baxters in 1967, when she was approximately six years of age, and she lived with them until the mid-1980s. Ms. Williams' father, Ken Baxter, worked for Square D beginning in the late 1960s until approximately 2003. Mr. Baxter was in or around Square D's mold room during the time Ms. Williams lived with him and was allegedly exposed to asbestos dust generated during the manufacturing process. Plaintiffs presented some evidence that Baxter routinely returned home in work clothes contaminated with asbestos dust and that his household members—including Ms. Williams—were repeatedly and regularly exposed to asbestos through laundering and close domestic contact.

This case arose from the mesothelioma diagnosis in 2016 of Ms. Williams at the age of fifty-four and asserted household ("take-home") exposure linked to asbestos-containing materials used in Square D's manufacturing operations and supplied by Union Carbide. Ms. Williams died from the disease approximately a year later. Prior to her death, Ms. Williams filed suit in Fayette Circuit Court against Square D and Union Carbide claiming exposure to asbestos. Her estate was substituted in her place and her husband and son added claims for loss of consortium. Appellee Estate of Vickie Williams ("Williams") alleges the dangerous manufacturing of these products resulted in her asbestos injury and resulting mesothelioma through the repeated exposure via her father's contaminated clothing.

5

Square D manufactured plastic electrical parts using molding compounds. A measurable amount of these molding compounds were purchased from Union Carbide until around 1974. These compounds contained asbestos fibers. Ms. Williams lived with the Baxters from 1967 until the mid-1980s. She testified that she frequently encountered her father's dusty work clothes, hugged him daily, and helped launder clothing. She was diagnosed with mesothelioma in 2016 and died approximately a year later. The suit alleged indirect exposure from her father's contaminated clothing and direct exposure during her brief employment. It includes claims against Square D in negligence and claims against Union Carbide in negligence and products liability.

Ms. Williams worked at Square D for a few months during the summer of 1978 as a teenager. The trial court found it significant that both the Williamses' experts and the defenses' experts agreed that no portion of Ms. Williams' injury was caused by her 1978 employment at Square D. Williams alleges that the disease resulted from long-term household exposure caused by defendants' negligent conduct and defective products.

## B. TRIAL COURT PROCEEDINGS.

These proceedings began in Fayette Circuit Court as a single case. The complaint alleged negligence and product liability as follows:

> Factual Basis of Claim . . . Plaintiff, Vickie Williams, was exposed both directly and indirectly, in the manner described herein, to asbestos containing products manufactured, sold, distributed, constructed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged, labeled and/or

6

otherwise placed into the stream of commerce by the Defendants.

. . . .

The Defendants and/or their predecessors have for many years either manufactured, produced, processed sold, distributed, constructed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged, labeled, maintained property and/or otherwise placed into the stream of commerce, asbestos containing products.

Ms. Williams alleged that managers and agents of Square D failed to implement proper rules and procedures to eliminate asbestos from being at or being taken home from the Lexington facility. The complaint continued:

The asbestos containing products manufactured, distributed, sold, constructed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged, labeled, and/or maintained by the Defendants reached the Plaintiff, Plaintiff's father and others, without any substantial change or any alteration from their original home. . . . The Defendants failed to insure that employees or occupants at job sites would be protected from harm by exposure to asbestos products that were defective, unreasonably dangerous.

The ten claims were:

COUNT I: STRICT LIABILITY - FAILURE TO WARN
COUNT II: STRICT LIABILITY - DESIGN DEFECT/CONSUMER EXPECTATION
COUNT III: NEGLIGENCE – FAILURE TO EXERCISE ORDINARY CARE
COUNT IV: NEGLIGENCE – FAILURE TO WARN
COUNT V: KENTUCKY OCCUPATIONAL DISEASE ACT KOSHA/OSHA
            VIOLATIONS (NEGLIGENCE PER SE)
COUNT VI: MISREPRESENTATION/CONSPIRACY TO DEFRAUD
COUNT VII: PUNITIVE DAMAGES
COUNT VIII: PERSONAL INJURIES
COUNT IX: LOSS OF SPOUSAL CONSORTIUM
COUNT X: LOSS OF PARENTAL CONSORTIUM

In a May 10, 2018, order, the circuit court denied Square D's motion for summary judgment, concluding (as to duty) that the Williamses had produced

7

evidence from which a factfinder could infer that take-home exposure risks to household members **were** foreseeable. Square D's affirmative defense that workers' compensation exclusivity applies was denied citing Square D's failure to set forth any legal authority supporting its position.

Square D pursued an interlocutory appeal on workers' compensation exclusivity under the *Ervin Cable* exception, which provides that unless a worker opts out of the workers' compensation system, the injured worker's recovery from the employer for sustained work-related injuries is limited to workers' compensation benefits. *Ervin Cable Constr. v. Lay*, 461 S.W.3d 422, 424 (Ky. App. 2015). After *Sheets v. Ford Motor Co.*,[3] that appeal was vacated and dismissed as procedurally improper, and the matter returned to circuit court. 626 S.W.3d 594 (Ky. 2021). Meanwhile, the circuit court granted summary judgment in favor of Union Carbide, finding that Union Carbide did not owe Ms. Williams a duty of care because her injuries were an unforeseeable risk. On remand, Square D promptly renewed its summary-judgment motion. On January 28, 2022, the circuit court granted summary judgment to Square D, expressly incorporating the reasoning of its prior 'no duty' ruling entered for Union Carbide.

---

[3] Square D pursued an interlocutory appeal after the trial court denied their motion for summary judgment on the exclusive remedy issue as then authorized by *Ervin Cable*. The Court of Appeals affirmed that decision. Subsequently, this Court issued its opinion in *Sheets* holding that an order denying a motion for summary judgment based on application of the Workers Compensation Act's exclusivity provision could not be reviewed until after a trial court's final judgment.

8

## C. COURT OF APPEALS.

The Court of Appeals reversed and held the 'bystander of a bystander' characterization by the trial court could not support summary judgment because the underlying exposure facts were disputed and must be viewed most favorably to the Williamses under Kentucky rules and *Steelvest*. Central to the court's analysis was that duty is not predicated on rigid classifications such as "bystander" or "nonuser" and that duty is measured in terms of foreseeability. Relying on Kentucky's recognition of a general duty of ordinary care and manufacturer duties extending beyond immediate users, the court concluded defendants were not entitled to judgment as a matter of law on duty. Appellants attempted to misconstrue the case at hand as one of premises liability and, in doing so, they seek to apply doctrines that do not govern the claims actually pleaded. The proper analysis of duty remains under Kentucky's traditional negligence and products-liability framework. This includes the focus on foreseeability and procedural posture. The Court of Appeals further held the characterization of the father as a bystander, and daughter as bystander-of-a-bystander, to be incorrect or, at the very least, in dispute. In sum, evidence exists to support a dispute regarding a genuine issue of material fact.

## II. STANDARD OF REVIEW

### Summary Judgment Standard of Review (CR 56.03 and *Steelvest*).

Because the trial court disposed of Williams' claims against Union Carbide and Square D on summary judgment, in order to prevail on appeal, the movant Appellants bear the initial burden of demonstrating that there is no genuine issue of material fact in dispute. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. The nonmovant must produce at least some affirmative evidence of a genuine issue for trial.

> We think it should be borne in mind that a motion for summary judgment is not a trick device for the premature termination of litigation. Its function is to secure a final judgment as a matter of law when there is no genuine issue of a material fact. . . . The burden is on the movant to establish the nonexistence of a material fact issue. He either establishes this beyond question or he does not. If any doubt exists, the motion should be denied.

*Conley v. Hall*, 395 S.W.2d 575, 580 (Ky. 1965); *see also Roberson v. Lampton,* 516 S.W.2d 838, 840 (Ky. 1974). "The standard of review on appeal of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law." *Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc.,* 90 S.W.3d 46, 49 (Ky. 2002). Summary judgment is only proper when "it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr, Inc.,*

10

807 S.W.2d 476, 480 (Ky. 1991). In ruling on a motion for summary judgment, the Court is required to construe the record "in a light most favorable to the party opposing the motion . . . and all doubts are to be resolved in his favor." *Id.* In *Steelvest,* the word "'impossible' is used in a practical sense, not in an absolute sense." *Perkins v. Hausladen,* 828 S.W.2d 652, 654 (Ky. 1992). In other words, the party opposing the motion then has the burden to present "at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest,* 807 S.W.2d at 480.

This is a negligence case which requires proof that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is to be measured, and (3) consequent injury. *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245, 247-48 (Ky. 1992). This Court later clarified "consequent injury" to be (3) causation and (4) damages. *Patton v. Bickford,* 529 S.W.3d 717, 729 (Ky. 2016); *Hayes v. D.C.I. Properties-D KY, LLC,* 563 S.W.3d 619, 622-23 (Ky. 2018).

Duty, the first element, presents a question of law. *Mullins,* 839 S.W.2d at 248. Thus, for Appellants Union Carbide and Square D to be entitled to judgment as a matter of law, they must show that (1) it was impossible for Williams to produce any evidence in her favor on one or more of the issues of fact, *Steelvest,* 807 S.W.2d at 483; and further must show (2) under the undisputed facts of the case, they owed no duty to Williams, *see Ashcraft v. Peoples Liberty Bank & Tr. Co., Inc.,* 724 S.W.2d 228 (Ky. App. 1986*)* ("If no duty is owed by the defendant to the plaintiff, there can be no breach thereof,

11

and therefore no actionable negligence."); or (3) as a matter of law, any breach of a duty it owed to Williams was not a legal cause of her injuries. *See id.*

## III. ANALYSIS

Whether Ms. Williams could produce any evidence in her favor on one or more of the issues of fact precludes a finding of summary judgment under *Steelvest*, 807 S.W.2d at 483. The record contains competing expert testimony on critical issues bearing on duty and foreseeability. Appellees' experts—including Drs. Egilman, Ellenbecker, and Roggli—opined that asbestos dust was known at the time to migrate on clothing, that repeated household exposure was a recognized pathway of harm, and that such exposure could cause mesothelioma. Appellants' experts—including Dr. Crapo and industrial hygienist Robert Adams—disputed the extent and significance of such exposure but did not conclusively negate its effects. These conflicting opinions, together with disputed evidence regarding Mr. Baxter's work location and the frequency of household contact, create genuine issues of material fact. Under Kentucky's summary judgment standard, such disputes must be resolved by a jury which is better suited to weigh the credibility and effect of such testimony, not the court. *Gersh v. Bowman*, 239 S.W.3d 567, 571-72 (Ky. App. 2007) (explaining that a jury may determine the weight and credibility of evidence.)

Here, the amount of time Mr. Baxter spent in or near the molding department, and thus the extent of asbestos-dust exposure, was a point of "great contention." Although Appellants characterize Mr. Baxter as an "office worker" or designer, the summary judgment record does not establish, as a

12

matter of law, that he was insulated from asbestos-generating processes. Evidence in the record reflects that Baxter spent substantial time on the production floor, overseeing process and production, and that he crossed through the molding areas regularly. The Williamses cited coworker testimony that he was frequently in the molding room, while Appellants characterized him as primarily office-based. The parties dispute the extent, frequency, and duration of his exposure in those areas. Much of these disputes are informed by competing expert opinions. Because foreseeability of take-home exposure turns in part on the nature and regularity of workplace contact with asbestos-containing materials, this factual dispute is material and must be resolved by a jury.

Under Kentucky's summary-judgment standard, courts do not resolve such conflicts or weigh credibility; they ask only whether a genuine issue exists when the evidence is viewed in the nonmovant's favor. Where, as here, foreseeability turns on contested exposure facts—such as whether Mr. Baxter was frequently in the molding department—the dispute itself precludes summary judgment.

## A. SUMMARY JUDGMENT WAS IMPROPER WHERE DUTY CAN BE FOUND AND THERE IS A GENUINE ISSUE OF A MATERIAL FACT.

### 1. Duty can be found if the risk of injury was foreseeable.

Whether a duty exists in this instance turns on application of settled Kentucky negligence and products-liability principles to the summary judgment record. "The first step in proving negligence is determining what duty, if any, the defendant owed the plaintiff." *Smith v. Smith,* 563 S.W.3d 14,

13

16 (Ky. 2018). Kentucky measures duty in terms of foreseeability as "a universal duty owed by all to all" but further explained as "'a duty of every person to every other person to exercise ordinary care in his activities to prevent foreseeable injury.'" *Dick's Sporting Goods, Inc. v. Webb*, 413 S.W.3d 891, 897 (Ky. 2013) (citing *Gas Serv. Co. v. City of London*, 687 S.W.2d 144, 148 (Ky. 1985) and *Grayson Fraternal Ord. of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328, 332 (Ky. 1987)).

The existence of a duty is a question of law informed by whether the defendant's conduct created a **foreseeable** risk of harm. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003). Kentucky recognizes a general duty of ordinary care, including an independent duty on manufacturers to design, manufacture, and distribute reasonably safe products. *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980). Duty is not defined by rigid classifications such as "bystander," "nonuser," or "nonconsumer." *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69-70 (Ky. 1973).

> In this analysis of legal duty, we have determined that the major issue is the question of foreseeability. In order to apply any "universal duty of care" to a particular circumstance, "it must appear that the harm was foreseeable and the facts must be viewed as they reasonably appeared to the parties charged with negligence...."

*Fryman v. Harrison*, 896 S.W.2d 908, 909 (Ky. 1995), *holding modified by Gaither v. Just. & Pub. Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014) (citing *North Hardin Devs. v. Corkran*, 839 S.W.2d 258 (Ky. 1992); *Mitchell v. Hadl*, 816 S.W.2d 183 (Ky. 1991)).

14

> In deciding whether harm was foreseeable, Kentucky courts look to the **general foreseeability** of harm, not to whether the particular, precise form of injury could be foreseen. *Miller v. Mills,* 257 S.W.2d 520 (Ky.1953). It is enough that injury of some kind to some person within the natural range of effect of the alleged negligent act could have been foreseen. *Id.*

*T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 531 (Ky. 2006)

(emphasis added). Rather, duty turns on the general foreseeability of harm

arising from the defendant's affirmative conduct, and where foreseeability

depends on disputed facts, summary judgment is inappropriate. *Steelvest,* 807

S.W.2d at 480.[4]

### a. Negligence: Duty Is a Question of Law, Foreseeability Is a Factor.

The Court of Appeals properly framed the issue before us as negligence

and products liability. Under a negligence theory, duty turns on foreseeability

of harm from the defendant's conduct. Critically, we do not find that Square D

owed a premises-based duty to the general public, or that employers always

owe a duty for take-home exposure, but confine our analysis to household

---

[4] Foreseeability of harm is distinct from foreseeability of litigation, or as the dissent states, a previously recognized "compensable risk" as such premise would bar recognition of any new duty because every claim of first impression would fail for a lack of prior adjudication. Kentucky negligence law must remain capable of addressing evolving industrial hazards. Additionally, the standard is not whether widespread public recognition exists, but whether industry actors knew or should have known as "[a]bsolute proof of knowledge is not required to create civil liability." *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 81 (Ky. 2010). Finally, reliance on *Martin v. Cincinnati Gas & Elec. Co.,* 561 F.3d 439 (6th Cir. 2009) is misplaced as nonbinding, "involving a[n exposure] timeframe a decade earlier" with an entirely different record, and predates our subsequent clarification of summary-judgment principles. It neither controls our analysis nor compels a finding of unforeseeability as a matter of law.

15

members with regular, repeated, close contact over an extended period consistent with a conduct-based negligence analysis.

To import premises concepts to narrow duty artificially attempts to apply doctrines that do not otherwise apply to negligence and products liability. Upon a careful reading of the pleadings, record, and briefs, references to "premises" were merely descriptive of location, not invocations of premises-liability doctrine upon the part of Williams. The alleged wrong is affirmative conduct—manufacturing, using, and distributing asbestos-containing materials in a manner that allegedly allowed hazardous fibers to leave the workplace.

Appellants claim the duty is narrow and exceptional, that foreseeability must be shown through prior similar incidents, that a "special relationship" must exist, and that the Court would be "creating new law" if it recognizes duty, a decision belonging to the General Assembly. That would be true if the case were solely premises liability. However, it is negligence and products liability. Duty has been found under existing Kentucky precedent.

**b. *Foreseeability Limits Duty to Harms a Reasonable Person Could Anticipate in Light of Existing Knowledge and Circumstances at the Time of the Conduct.***

**Brief History of Asbestos Knowledge**. By the mid-twentieth century— well before the period relevant to this case—the health hazards associated with asbestos were widely recognized within industry, government, and the scientific community. Asbestos dust was known to become airborne during routine industrial processes and to cause serious disease, including mesothelioma.

16

Kentucky courts acknowledged by the early 1960s that airborne asbestos dust constituted a dangerous industrial hazard. *Bethlehem Mines Corp. v. Davis*, 368 S.W.2d 176, 177 (Ky. 1963). This Court held that actual knowledge of asbestos hazards was so pervasive by 1969 in the pipefitting industry that "the whole industry—including the empty-chair defendants—knew of the risks." *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64 (Ky. 2010). A paper written in 1930 articulated that an asbestos-related disease could be acquired by merely "any exposure to asbestos." *Id.*

By the 1960s, it was also understood that asbestos fibers could adhere to clothing and be transported beyond the workplace. Industry practices at certain facilities—including protective clothing, changing rooms, and on-site laundering—were adopted specifically to prevent workers from carrying asbestos fibers home and exposing family members. The record reflects testimony acknowledging that such measures were implemented for the express purpose of protecting workers' families, supporting the conclusion that secondary or "take-home" exposure was a known and anticipated risk during the relevant period.

Regulatory action reflected this understanding. In 1972, OSHA promulgated comprehensive asbestos standards addressing airborne exposure limits and employee hygiene practices, including the handling of contaminated clothing. Manufacturers and suppliers of asbestos-containing materials operated within this established body of knowledge. Under Kentucky law, manufacturers are charged with knowledge of the dangers inherent in their

17

products and the reasonably foreseeable ways in which those products may cause harm. *Nichols,* 602 S.W.2d at 433. This historical context informs the foreseeability inquiry and, viewed in the light most favorable to the non-movant, precludes negating duty as a matter of law at the summary-judgment stage.

### c. *Foreseeability of the Harm as a Natural and Probable Consequence of the Conduct.*

We emphasize the bounded nature of the duty analysis as described by the Court of Appeals: this case does not involve 'random, sporadic, or isolated' contact, and the duty recognized is to household members who 'regularly and repeatedly' came into close contact with contaminated work clothing over an extended period—not the general public. The competing expert testimony in this record bears directly on whether the alleged exposure falls within this bounded category. Appellees' experts opined that repeated laundering, physical contact, and re-entrainment of asbestos fibers in the home constitute medically significant exposure pathways. Appellants' experts disputed the magnitude and significance of those exposures. These conflicts, together with disputed evidence regarding the frequency of Mr. Baxter's presence in production areas, create genuine issues of material fact as to whether the alleged domestic contact was sufficiently regular and repeated to render injury foreseeable. Such determinations cannot be resolved at summary judgment. *Steelvest,* 807 S.W.2d at 480. We do not recognize a universal "take-home asbestos" duty, nor do we impose a duty to the general public. The duty which could be found here is confined to individuals alleged to have experienced

18

regular and repeated domestic contact with asbestos-contaminated work clothing over an extended period of time, such that injury from the defendant's conduct or products was reasonably foreseeable. Casual, incidental, or transitory contact falls outside the scope of this duty.

Square D cites to the *Napper/Reeves* line of cases as determinative of duty in the case before us. *Reeves* requires policy analysis; it does not convert products-liability duty into categorical immunity. When this Court applied decades-old precedent which held that

> a landowner has a duty to protect patrons from third-party acts only if he or she "knows of activities or conduct of other patrons or third persons which would lead a reasonably prudent person to believe or anticipate that injury to a patron might be caused," and if he or she can reasonably safeguard against them,

we were referencing a premises owner's duty to protect visitors from third-party criminal acts. *Walmart, Inc. v. Reeves*, 671 S.W.3d 24, 28 (Ky. 2023) (quoting *Napper v. Kenwood Drive-In Theatre Co.*, 310 S.W.2d 270, 271 (Ky. 1958)). A duty could be imposed if the criminal conduct was determined to be foreseeable. In *Reeves*, we held no duty to protect visitors from those unforeseeable third-party criminal acts—a context the Court itself treats as exceptional because the harm is produced by an intervening third party rather than the defendant's own product or conduct. Limiting duty due to the unforeseeable intervention of a criminal act is highly distinguishable from the facts in this case.

19

Square D alleges this Court categorically rejected a universal duty of care on business owners "to protect all visitors against all third-party acts" based on a policy analysis, citing repeatedly to our decision in *Reeves*, 671 S.W.3d at 29. Union Carbide claims in its brief, "[c]reating a duty to warn those in Ms. Williams's position relative to the product manufacturer would impose excessive and unworkable burdens on those manufacturers." We hold finding a duty under the specific circumstances of facts before us today would not. Further, this duty is consistent with existing liability law.

*Reeves* confirms that courts must consider policy implications before expanding duty, while *Shelton v. Kentucky Easter Seals Society, Inc.* instructs that duty is a question of law defined by general categories of cases, not by the particularized facts of an individual plaintiff. 413 S.W.3d 901, 906–07 (Ky. 2013). The limiting principle applied here complies with both directives. By defining duty to extend only to individuals alleged to have experienced **regular and repeated domestic contact with asbestos-contaminated work clothing**, the Court articulates a categorical boundary grounded in foreseeability, while leaving case-specific questions—such as the frequency, duration, and nature of contact—to the jury.

This approach preserves *Shelton's* separation between duty as a legal determination and breach as a factual inquiry and avoids the fact-bound duty analysis *Shelton* cautioned against. The disputed facts determine whether this case falls within the defined category, not whether the category itself exists. Accordingly, we reiterate the narrow scope of today's holding: we do not

20

recognize a universal "take-home asbestos" duty, nor do we impose a duty to the general public. Rather, duty is confined to circumstances in which prolonged, regular domestic exposure renders harm reasonably foreseeable based on the defendant's conduct or products. This limitation reflects Kentucky's long-standing reluctance to impose categorical duties divorced from factual context and is consistent with *Pathways*, 113 S.W.3d at 89 (Ky. 2003), and *Grayson Fraternal Order of Eagles v. Claywell*, 736 S.W.2d 328, 332 (Ky. 1987).

Manufacturers, businesses, and commercial entities are sophisticated actors that regularly write and enter contracts with their customers and suppliers. To warn its customer, to require its customer to warn its employees, to indemnify itself via contract, or to take an act requiring the mere posting of a warning label, is standard business practice that fails to "create an economically untenable reality for business owners and, ultimately, their customers." *Reeves,* 671 S.W.3d at 29. While in the situation of *Reeves*, this Court reaffirmed the *Napper* premises-liability exception that states a landowner owes a limited duty to protect patrons from third-party criminal acts only if the owner knows or has reason to know such acts are occurring or are about to occur. *Napper,* 310 S.W.2d at 271. That case differs from this in every doctrinally significant respect. Further, Square D's potential liability in particular arises under ordinary negligence, based on affirmative conduct in the use and handling of asbestos-containing materials in their processes by allegedly failing to implement hygiene and exposure controls thereby allowing

21

foreseeable fiber migration off-site via contaminated clothing. Products liability imposes an independent manufacturer's duty to design, manufacture, and distribute reasonably safe products. *See Nichols,* 602 S.W.2d at 433.

> A party injured by a **product** can bring suit for that injury under three different theories: (1) breach of warranty under the Uniform Commercial Code, (2) negligence, or (3) strict liability in tort. *See Williams v. Fulmer,* Ky., 695 S.W.2d 411 (1985). When the case involves a retrofit, the plaintiff is claiming the product was defectively designed. Here, for example, Ostendorf claims the C–300 forklift was defectively designed because it did not have operator safety restraints. A plaintiff in Kentucky can bring a defective design claim under either a theory of negligence or strict liability. The foundation of both theories is that the product is "unreasonably dangerous." *Ulrich v. Kasco Abrasives Co.,* Ky., 532 S.W.2d 197, 200 (1976). Whereas **negligence** examines the conduct of the manufacturer—**could the manufacturer foresee the harm to the plaintiff** and **did the manufacturer act reasonably** to prevent that harm—strict liability typically evaluates the condition of the product. But in a negligent design case, even a strict liability claim examines the manufacturer's conduct. *See Nichols v. Union Underwear Co. Inc.,* Ky., 602 S.W.2d 429 (1980) (distinction between strict liability and negligence "is of no practical significance so far as the standard of conduct required of the defendant"). So under either theory, **it is the legal duty of a manufacturer to use reasonable care to protect against foreseeable dangers.**

*Ostendorf v. Clark Equip. Co.,* 122 S.W.3d 530, 535 (Ky. 2003) (emphasis added).

Appellees produced evidence, viewed in the light most favorable to them, that by the relevant time period, asbestos dust was widely recognized as a hazardous substance, that asbestos fibers could adhere to clothing and be transported beyond the workplace, and that prolonged exposure to such fibers could cause mesothelioma. Whether Appellants knew or should have known of

22

these risks, and whether their conduct fell below the standard of ordinary care, are classic jury questions.

Courts must be careful not to collapse duty into breach or causation, particularly at the summary judgment stage. Applying these principles, the Court of Appeals correctly concluded that duty could not be negated as a matter of law.

The Court of Appeals did not hold that Appellants owed a duty to the general public, expressly confining the analysis to household members allegedly subjected to regular, repeated exposure through contaminated work clothing. Consistent with Kentucky's reluctance to announce categorical duty rules divorced from factual context, this narrow framing also limits blanket liability and immunity. Similarly, it aligns with limiting frameworks other states have successfully applied without a flooding of recourse.

### d. Products Liability: Foreseeability is Unnecessary Pursuant to the Products Liability Act, Analyzed at the Breach Stage.

The duty framework applies with equal force in Kentucky products-liability law, which imposes an independent obligation on manufacturers to place reasonably safe products into the stream of commerce. No "special duty" or relationship must be shown, as we established in *Embs v. Pepsi-Cola Bottling Co. of Lexington, Ky., Inc.*, 528 S.W.2d 703, 705 (Ky. 1975) when we found no essential reason why non-consumers should not be brought within the scope of protection afforded by the adopted view of strict liability in tort law expressed in Section 402A of the American Law Institute's Restatement of Torts 2d.

Kentucky products liability is strict liability, and once strict liability is accepted, "bystander recovery is fait accompli." *Embs*, 528 S.W.2d at 705. The Court of Appeals relied on that principle and *CertainTeed Corp.*, 330 S.W.3d at 77, in rejecting a categorical 'bystander-of-a-bystander' no-duty rule.

Duty analysis focuses on conduct and foreseeability, not rigid classifications. *T&M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526 (Ky. 2006). Under this framework and applying these principles to the summary judgement record, we disagree with the trial court's finding of no duty to a "bystander-of-a-bystander" and that Union Carbide's "duty as a product manufacturer did not extend to secondary exposures to asbestos that Ms. Williams may have experienced as a result of her contact with Mr. Baxter or the environment he occupied after leaving the premises owned and operated by UCC's customer."

2. **Conflicting Evidence Creating an Issue of a Material Fact Precludes Summary Judgment.**

As per the March 21, 2018, hearing, Appellee cited Carlos Martino, agent for Union Carbide, as having testified to **actual** knowledge when he stated by 1968, they were "providing protective clothing to the individuals at the Bound Brook facility and the express reason we did that was we knew they could take asbestos home and harm their families."

Dr. Michael Ellenbecker is a Certified Industrial Hygienist ("CIH") who confirmed that more likely than not, Mr. Baxter was frequently exposed to asbestos-containing products while working in Square D's mold room, that Ms. Williams' only asbestos exposure was from his contaminated work clothes, and

24

that the exposures were directly a percentage relative to Union Carbide's supplied asbestos products.

Donald Marano for Square D testified that "Square D was still machining parts in the plant that contained asbestos and that the potential existed" and went on to say

> any exposure that [Williams] would have had from this – from working there for that two months would have been indistinguishable from any exposure that she may have had from laundering her father's work clothing when he came home from – from working there, if she had any exposure to that at all.

His opinion contested any exposure existed contrasting with Ellenbecker's claim there was frequent exposure.

Industrial Hygienist Robert Adams for Union Carbide also testified he did not have any "information that would provide [him] any ability to testify to any other exposures she had beyond the household exposures that are alleged from the use of the phenolic molding compounds that her father would have brought home on his work clothes."

Dr. David Egilman provided a self-prepared series of PowerPoint slides setting forth what Square D and Union Carbide knew or should have known of the hazards of take-home exposures during the alleged relevant timeframe referencing a study that mathematically predicted what the rates of mesothelioma in people would be at lower exposures.

> **Q** (By Mr. Woods) All right. So now let's talk about exposures that Ms. Williams may have experienced during the time period that she lived with Mr. Baxter. And I think you mentioned several different methods of exposure that she may have had. One was in the car?

25

**A** Yes.

**Q** Riding in the car where he had previously ridden with clothing that was contaminated with asbestos; correct?
**A** Correct.

**Q** and laundering Mr. Baxter's clothes?
**A** Correct.

**Q** Having direct contact with Mr. Baxter after he worked at Square D after–with his clothes after he worked at Square D?
**A** Correct. When he came home, if she came and hugged him or came in contact with him, correct.

**Q** and then the last one was the re-entrainment of asbestos in the house?
**A** Correct.

**Q** Which had been deposited from his clothes at some point?
**A** Correct.

**Q** Do you have – well, first of all, can you quantify the exposures to asbestos that Mr. –I'm sorry Ms. Williams had from any of those sources?
**A** With a number, no.

**Q** Can you give me a range of what her exposures would have been to asbestos from any of those sources?
**A** A range? You know, I can only go from the **Manville '76 testimony in OSHA** which says that the **home exposures, particularly to children,** are much more important or more significant than occupational exposures because they're 24-hour-a-day exposures and there's re-entrainment and they occur at a younger age. So given the fact that meso has got a long latent period, you've got a – those are – those exposures **are more likely to cause harm**.

Deposition of Dr. Egilman p. 161-63 (emphasis added). Dr. Egilman indicated contested claims regarding the issue of impact or significance of the timing and duration upon a child from such exposures in addition to the frequency.

Conflicting evidence regarding a material issue of fact, whether or not Williams was exposed to asbestos, is sufficient to preclude summary judgment.

26

**B. LIMITATION OF EXPERT TESTIMONY REQUIRES A SHOWING OF ACTUAL PREJUDICE.**

Square D and Union Carbide argued that Dr. David Egilman's opinions should be limited because they were not sufficiently disclosed in formal expert reports, and some were presented through deposition testimony and demonstrative materials (PowerPoint). No *Daubert* hearing was conducted, no finding that his methodology was unreliable was made, and there was no finding of surprise or inability to cross-examine. Despite this, the trial court limited Dr. Egilman's testimony. The restricted testimony included historical knowledge evidence, industry-wide foreseeability opinions, and take-home exposure pathway testimony. The limitation occurred while summary judgment was pending. The Court of Appeals vacated the limitation because (1) depositions serve the disclosure function of CR 26.02 and 26.05, and (2) the trial court did not find prejudice; without prejudice, there is no valid basis to exclude or limit testimony. The order thus improperly affected the summary-judgment analysis by restricting evidence relevant to foreseeability and duty.

Square D and Union Carbide contend that the Court of Appeals erred in vacating the trial court's order limiting the testimony of Appellees' expert, Dr. David Egilman, based on alleged deficiencies in expert disclosure. We disagree.

The admission or exclusion of expert testimony lies within the sound discretion of the trial court. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). However, that discretion is not unbounded. A trial court abuses its discretion when its decision is arbitrary, unreasonable,

27

unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Kentucky law is clear that exclusion of expert testimony is a severe sanction, and absent a showing of actual prejudice, it is generally disfavored. *Clephas v. Garlock, Inc.*, 168 S.W.3d 389, 393–94 (Ky. App. 2004*); Tamme v. Commonwealth*, 973 S.W.2d 13, 32 (Ky. 1998). The purpose of expert disclosure rules is to prevent surprise and allow meaningful cross-examination—not to provide a procedural mechanism for exclusion where the opposing party is already aware of the substance of the testimony.

Here, as the Court of Appeals correctly observed, Dr. Egilman's opinions were disclosed through deposition testimony, which "served the same function as formal disclosure." The record reflects that Appellants were aware of the substance of Dr. Egilman's opinions, had the opportunity to examine him at length, and identified no specific prejudice resulting from the manner of disclosure. Absent such a showing, exclusion or limitation of testimony constitutes an abuse of discretion. *Clephas*, 168 S.W.3d at 394.

Moreover, at the summary-judgment stage, expert testimony should not be limited in a manner that effectively weighs credibility or resolves disputed factual issues. *Steelvest*, 807 S.W.2d at 480. The trial court's limitation of Dr. Egilman's testimony had precisely that effect.

Accordingly, we agree with the Court of Appeals that the trial court erred in limiting Dr. Egilman's testimony without a finding of prejudice. The Court of Appeals properly vacated that order, and we affirm its ruling on this issue.

Here, absent a showing of prejudice, excluding or limiting expert testimony was an abuse of discretion.

## C. WORKERS' COMPENSATION EXCLUSIVITY.

Whether the trial court has acted outside its jurisdiction is a question of law. Therefore, the standard of review is de novo. *Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803, 810 (Ky. 2004); *Hinners v. Robey*, 336 S.W.3d 891 (Ky. 2011).

The Workers' Compensation Act is a statutory system designed to compensate an injured worker or the worker's dependents for economic loss sustained as a result of work-related injury, disease or death. KRS 342.0011.

> The primary purpose of the Workers' Compensation Act is to aid injured or deceased workers and statutes are to be interpreted in a manner that is consistent with their beneficent purpose. The overarching purpose of the workers' compensation chapter is to compensate workers who are injured in the course of their employment for necessary medical treatment and for a loss of wage-earning capacity, without regard to fault, thereby enabling them to meet their essential economic needs and those of their dependents.

*Kindred Healthcare v. Harper*, 642 S.W.3d 672, 679 (Ky. 2022).

Generally, workers' compensation is an exclusive remedy. "If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee ... on account of such injury or death." KRS 342.690(1). Exclusivity applies to injuries "arising out of and in the course of employment." KRS 342.0011. "Essentially, the exclusive remedy provision grants immunity for liability arising from common law and statutory

29

claims, meaning such claims cannot be pursued in the courts of this Commonwealth." *Ky. Emps. Mut. Ins. v. Coleman,* 236 S.W.3d 9, 13 (Ky. 2007).

However, the "exclusive remedy" protection covered by Kentucky's Workers' Compensation Act only applies to those injuries and diseases which arise "out of and in the course of employment," and must be considered "work-related" or "occupational." *See* KRS 342.0011(1) and (2). Larson helpfully gives two examples of when an injury is not considered to have arisen "out of and in the course of employment:"

> Suppose plaintiff is a clerk in defendant's store. On a day when she is off work, she goes into the store to buy a dress, and is hit in the eye by a hanger as a result of the sales clerk's negligence. Obviously she can sue the store and the co-employee. Or, suppose a nurse who works for the defendant hospital happens to be involved in a weekend accident while driving past the hospital, and is rushed to hospital's emergency room, where the alleged malpractice occurs. Here again, no one would contend that her suit is barred.

Arther Larson & Lex K. Larson, LARSON'S WORKERS' COMPENSATION LAW, § 113.08 (2007) (internal footnotes omitted).

Square D argues exclusivity applies to bar these proceedings because the complaint referenced exposure during Vickie's brief 1978 employment. The Court of Appeals, however, noted that the medical and expert proof during discovery attributed her mesothelioma to household exposure from work clothing—not from that brief summer job—and the circuit court found both sides' experts agreed no portion of the injury was caused by the employment.

Here, all experts agree that Ms. Williams's brief summer employment did not cause her disease, nullifying the "arise out of and in the course of

30

employment" requirement. That undisputed record evidence defeats exclusivity as a matter of law. Williams alleges non-occupational household exposure occurring before and after that employment. The coverage available to Kentucky workers under KRS 342 for workers' compensation cannot convert non-occupational exposure into employers' immunity. We hold, upon a showing the injury did not arise "out of or in the course of" the employment, Square D would not be entitled to immunity. Therefore, here, workers' compensation immunity and exclusivity do not apply.

## IV. CONCLUSION

We hold foreseeability determinative of an existing duty and genuine issues of material fact exist under the specific facts of this case. For the foregoing reasons, we affirm the Court of Appeals and remand this matter for further proceedings consistent with this opinion.

Lambert, C.J.; Bisig, Conley, Keller, and Thompson, JJ.; and Special Justice Adrian Mendiondo and Special Justice Julie Tennyson sitting. Lambert, C.J.; Bisig, and Conley, JJ.; and Special Justice Mendiondo and Special Justice Tennyson concur. Thompson, J., concurs in part and dissents in part by separate opinion. Nickell and Goodwine, JJ., not sitting.

THOMPSON, J., CONCURRING IN PART AND DISSENTING IN PART: I have much sympathy for what Vickie Williams and her family have suffered from her alleged exposure to "take home" asbestos from her father's employment at Square D, and her subsequent death from Mesothelioma, which through the lens of hindsight appears wholly preventable. However, not all

31

tragedies come with legal responsibility. I cannot agree with the majority that her injury was reasonably foreseeable to Schneider Electric USA, Inc. F/K/A Square D based on what was generally known at the time of her alleged exposure from 1967 through 1974. Without foreseeability, Square D cannot be legally responsible for her and her family's injuries based on ordinary negligence.

As to Union Carbide's responsibility for producing a hazardous product, its own actual knowledge about the risks its product posed to bystanders by 1968 is enough to survive summary judgment. Therefore, I concur with the majority opinion that summary judgment should not have been granted to Union Carbide.

The first toxic tort theory cases, which began with asbestos cases, were filed in the 1970s.[5] In 1973, *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1093 (5th Cir. 1973), a valid cause of action for workers exposed to asbestos was first recognized, on the basis that such an injury was foreseeable. *Borel* involved a worker subjected to heavy concentrations of asbestos dust in the manufacturer process of insulation for more than thirty years, with his exposure ending in 1969. *Id.* at 1081-82.

It was not until 2006, that the first cause of action for "take home" asbestos was first recognized. *Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1149

---

[5] 57 Am. Jur. Trials 395 (Originally published in 1995); Richard A. Solomon, Esq. *Clearing the Air: Resolving the Asbestos Personal Injury Litigation Crisis*, 2 Fordham Envtl. L. Rep. 125 (1991).

(N.J. 2006). Currently, about eleven jurisdictions recognize a duty based on secondary exposure.

Based on such a history, employers simply had no reason to consider that exposure to contaminated clothing would cause both damage and a compensable risk to a third party, at least in the absence of a definitive connection between such clothing and such risk during the time period when Williams was exposed.

While in Kentucky every person owes a duty to every other person to exercise ordinary care to prevent foreseeable injuries, such duty cannot apply if the injury is not foreseeable. *Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999). In determining whether the harm is foreseeable, "proper application of negligence law requires courts to view the facts as they reasonably appeared to the party charged with negligence [at the time of causation of the injury]. We are not at liberty to impose liability based on hindsight." *Mitchell v. Hadl*, 816 S.W.2d 183, 186 (Ky. 1991). If the harm is not foreseeable, no duty of reasonable care can be owed. *Lhotsky ex rel. Lhotsky v. Sutcliffe*, 723 S.W.3d 842, 852 (Ky. App. 2025). "The mere fact that the risk may have materialized does little to resolve the foreseeability question." *James v. Meow Media, Inc.*, 300 F.3d 683, 692 (6th Cir. 2002).

The experts for Williams can establish that the risk to employees' health from exposure to asbestos was known within the medical community at the time of her exposure. The experts can also establish that it was also known in the medical community that some noxious substances could result in "take

33

home" disease. But what the experts cannot establish is that it was reasonably foreseeable to Square D, during the relevant time period, that asbestos was one of those substances which, when taken home on a worker's clothing or person, would cause exposure in sufficient concentrations to harm household members.

I am persuaded by the opinion of *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439 (6th Cir. 2009), which correctly applied Kentucky law to reject that a similar claim regarding "take home" asbestos involving a timeframe a decade earlier could survive summary judgment, ruling that as a matter of law the consequences of such exposure were not reasonably foreseeable. Thus, liability for negligence was precluded. *Id.* at 445-46.

The Court noted in evaluating such a claim that:

In Kentucky, there is a universal duty of care which requires "every person . . . to exercise ordinary care in his activities to prevent foreseeable injury." *Lee v. Farmer's Rural Elec. Cooperative Corp.,* 245 S.W.3d 209, 212 (Ky.Ct.App.2007) (quoting *Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell,* 736 S.W.2d 328, 332 (Ky. 1987)). "'The most important factor in determining whether a duty exists is foreseeability.'" *Pathways [v. Hammons],* 113 S.W.3d [85,] 89 [(Ky. 2003)] (quoting David J. Leibson, Kentucky Practice, Tort Law § 10.2 (1995)); *see also Fryman v. Harrison,* 896 S.W.2d 908, 909 (Ky. 1995). Foreseeability, in turn, is determined based on "what the defendant knew at the time of the alleged negligence." *Pathways,* 113 S.W.3d at 90; *see also James v. Wilson,* 95 S.W.3d 875, 891 (Ky. Ct. App. 2002) ("[F]oreseeability is to be determined by viewing the facts as they reasonably appeared to the party charged with negligence, not as they appear based on hindsight."). "[P]roper application of negligence law requires courts to view the facts as they reasonably appeared to the party charged with negligence." *Mitchell v. Hadl,* 816 S.W.2d 183, 186 (Ky. 1991).

34

> The defendant's knowledge at the time includes "knowledge of pertinent matters . . . as a reasonable man would have." *Pathways,* 113 S.W.3d at 90 (quoting Restatement (Second) of Torts § 289(a)). This knowledge includes the "capacities of things and forces in so far as **they are matters of common knowledge at the time and in the community**." *Id.* (quoting Restatement (Second) of Torts § 290(a)).

*Id.* at 444 (footnote omitted) (emphasis added).

In *Martin*, like here regarding Square D, there is no evidence that the defendants had actual knowledge of the danger of bystander exposure to household members from workers' contaminated clothing during the time frame at issue. "[S]o the question is whether [Square D] should have known: that is, was such a risk [from 'take home' asbestos to household members based on use of a molding compound containing asbestos] foreseeable to [it] based on 'common knowledge at the time and in the community.'" *Martin*, 561 F.3d at 445 (quoting *Pathways,* 113 S.W.3d at 90). Without foreseeability of any injury from take home exposure, there can be neither negligence nor products liability. *Id.* at 446-47.

While the experts' reports establish that by the 1950s and 1960s, mesothelioma was linked to exposure to asbestos, and there was some indication that others outside of the workplace could be exposed, Williams has not established that it was common knowledge that "take home" asbestos could cause mesothelioma among household members during the requisite time period. The publication of "Asbestos: Airborne Danger" by the U.S. Department of Labor in its May-June 1972 issue of *Safety Standards* focused on protecting workers. The Occupational Safety and Health Guideline for Asbestos Potential

35

Human Carcinogen in 1988 and the National Institute of Occupational Safety and Health Report to Congress on Workers' Home Contamination Study Conducted Under the Workers' Family Protection Act from 1995, cannot establish that the danger of "take home" asbestos was well established from 1967-74. Neither can studies specifically identifying danger to family members published in 1976, 1978, and later. Although some studies earlier than these mentioned environmental exposures, it is simply not established that this information was sufficiently widespread to make it common knowledge within the industries of which Square D was a part.

The risk to Williams as a household member of her father, who allegedly brought home asbestos fibers on his clothing from his work at Square D and exposed her to the fibers when she hugged him while he was wearing contaminated clothing, laundered his contaminated clothing, or was simply exposed to the fibers which became present in the home, was not reasonably foreseeable during the window of time in which she was most likely to be exposed—from her adoption in 1967 until Square D discontinued its use of the molding compounds in 1974.

While there may have been rare theories that a household member could be harmed by particles taken home on an employee's clothing near the end of Williams's exposure period, I do not believe that is enough to create liability under these circumstances.

In contrast, as to Union Carbide, there was more evidence that this company knew of the risk regarding its asbestos-laden molding compound,

making it reasonably foreseeable that bystanders would be injured by this product. For example, *The Asbestos as a Health Hazard in the United Kingdom*, by I.C. Sayers, dated December 5, 1967, regarding Union Carbide U.K. Limited, demonstrates that a risk to workers working with materials containing asbestos was established by that time. Similarly, trial and deposition testimony submitted as exhibits here from other cases reveals that by 1968 Union Carbide understood the dangers of exposure to asbestos to their workers and that something would need to be done to mitigate such risk. I am persuaded by the majority opinion's citation to Carlos Martino, agent for Union Carbide having testified to **actual** knowledge of a risk to others by 1968 when they were "providing protective clothing to the individuals at the Bound Brook facility and the express reason we did that was **we knew they could take asbestos home and harm their families**." This knowledge was then behind providing workers working with asbestos at Union Carbide generally with protective suits and air-line respirators, and phasing out the use of asbestos by 1974. Collectively, this is enough to survive summary judgment regarding Union Carbide's production of a hazardous product because in this case there is evidence that the danger from secondary exposure was reasonably foreseeable at the time of Williams's exposure based on Union Carbide's actual knowledge of the risk posed by its product.

While the danger of secondary exposure to asbestos through contaminated clothing is now well-known, I disagree that such danger was reasonably foreseeable to Square D during the relevant time period at issue

37

based on the general knowledge available to it. In contrast, Williams established that Union Carbide had actual knowledge as to the risk its products posed to third parties, thereby making Williams's injuries foreseeable and establishing that summary judgment should not have been granted to it.

Accordingly, I concur in part and dissent in part.

COUNSEL FOR APPELLANT/APPELLEE,
SCHNEIDER ELECTRIC USA, INC. F/K/A SQUARE D:

Todd Smith Page
Matthew Ryan Parsons
Palmer Gene Vance, II
Stoll Keenon Ogden PLLC


COUNSEL FOR APPELLANT/APPELLEE,
UNION CARBIDE CORPORATION:

Brantley Cole Rowlen
Lewis Brisbois Bisbaard & Smith, LLP

Michael Patrick Abate
Burt Anthony Stinson
Kaplan Johnson Abate & Bird LLP

Brett Legner
Michael A. Scodro
Craig A. Woods
Mayer Brown LLP


COUNSEL FOR APPELLEES, PAUL WILLIAMS, AS EXECUTOR OF THE
ESTATE OF VICKIE WILLIAMS; COLBY WILLIAMS, BY AND THROUGH HIS
PARENT AND NEXT FRIEND, PAUL WILLIAMS; AND PAUL WILLIAMS,
INDIVIDUALLY:

Kevin Crosby Burke
Jamie Kristin Neal
Burke Neal PLLC

Paul James Ivie
Paul Jason Kelley
Joseph Donald Satterley
Satterley & Kelley PLLC

COUNSEL FOR AMICUS CURIAE,
AMERICAN ASSOCIATION FOR JUSTICE:

Tad Thomas
Thomas Law Offices PLLC

COUNSEL FOR AMICUS CURIAE,
KENTUCKY JUSTICE ASSOCIATION:

Paul A. Casi, II
Paul A. Casi, II, P.S.C.

Penny Hendy
Hendy Johnson Vaughn P.S.C.

Matthew McGill
Lowder & McGill, PLLC


COUNSEL FOR AMICI, AMERICAN PROPERTY CASUALTY INSURANCE
ASSOCIATION; AMERICAN TORT REFORM ASSOCIATION; CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA; COALITION FOR
LITIGATION JUSTICE, INC.; KENTUCKY CHAMBER OF COMMERCE;
NATIONAL ASSOCIATION OF MANUFACTURERS; NATIONAL ASSOCIATION
OF MUTUAL INSURANCE COMPANIES; NATIONAL FEDERATION OF
INDEPENDENT SMALL BUSINESS LEGAL CENTER, INC.:

Mark A. Behrens
Shook, Hardy & Bacon L.L.P.

Bethany A. Breetz
Whitney Frazier Watt
Stites & Harbison, PLLC